IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **VICKI RAY BELL,** | } |
| | } |
|     **Plaintiff,** | } |
| | } |
| v. | }    **Civil Action No.: 2:12-CV-02094-RDP** |
| | } |
| **CAROLYN W. COLVIN,** | } |
| **Acting Commissioner,** | } |
| **Social Security Administration,** | } |
| | } |
|     **Defendant.** | } |

## MEMORANDUM OF DECISION

Vicki Ray Bell ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the Commissioner of Social Security[1] ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB") under Title II of the Act. 42 U.S.C. § 405(g). For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed.

**I.     Proceedings Below**

Plaintiff filed an application for disability and DIB on February 21, 2008, alleging onset of disability that day. [R. 93, 121, 115]. Plaintiff's application was denied on August 7, 2008. [R. 53]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). [R. 58-59]. Plaintiff's request for a hearing was granted and the first hearing was held on December 3, 2009, with a supplemental hearing being held on July 8, 2010. [R. 22, 35-50, 241-83].

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as Defendant in this suit. ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

In his decision dated July 14, 2010, the ALJ determined that Plaintiff was not eligible for a period of disability or DIB because she failed to meet the disability requirements of the Act. [R. 22, 30]. After the Appeals Council denied Plaintiff's request for review of the ALJ's decision, that decision became the final decision of the Commissioner, and therefore a proper subject of this court's review. [R. 1-4]. 42 U.S.C. § 405(g).

During the initial hearing in December 2009, the ALJ awarded Plaintiff and her attorney sixty days in order to obtain additional documentation and further develop the record. [R. 277-83]. The ALJ was concerned with the lack of documentation as to Plaintiff's alleged drug possession conviction, her clean drug tests, and inconsistencies between Dr. Neville and Dr. Huggins' assessments of Plaintiff. [*Id.*].

At the time of the supplemental hearing held on July 8, 2010, Plaintiff was 55 years old and had a high school education. [R. 35, 93, 173]. Plaintiff had previous work experience as a data entry clerk. [R. 47]. She alleges that she is unable to work due to depression and anxiety attacks. Plaintiff testified that since her first hearing her condition "seem[ed] to be worse." [R. 42]. Plaintiff stated that she cannot function and that she experiences anxiety any time she tries to cook, get dressed, or perform other household chores. [R. 42-43]. Plaintiff indicated that she is able to sleep only if she is taking Klonopin and that she cries "all the time." [R. 44]. Plaintiff confirmed that her medication helps, but causes her to have an upset stomach and make her "sleepy." [R. 46].

Plaintiff was charged with cocaine possession in October 2009 and shortly afterward began participating in the TASC program. [R. 45]. Plaintiff testified that cocaine, not belonging to her, was found in her car after she was pulled over by police for expired tags. [*Id.*]. She also

stated, at her initial hearing, that the traffic stop occurred in 2007, before she filed for disability and prior to her hospitalization at Brookwood. [R. 250-52].

The record shows that Plaintiff presented to the Brookwood Medical Center Emergency Room on February 8, 2008 requesting help with her "drug problem." [R. 161]. Reportedly, Plaintiff was using methadone and Lortab. [R. 161-68]. Treating physician, Dr. Gregory Ledbetter, noted that Plaintiff had stopped her methadone one week prior and had been using Lortab to supplement, and "would like to come off all these medications." [R. 167]. Plaintiff indicated that she had some depression but was not suicidal. [*Id.*]. Dr. Ledbetter's treatment notes indicate Plaintiff was "disheveled," but in "no acute distress." [*Id.*]. After an examination, Dr. Ledbetter diagnosed Plaintiff with substance abuse. [*Id.*]. According to his treatment plan, Dr. Ledbetter would provide Plaintiff with information regarding long-term rehabilitation facilities and would refer Plaintiff to a psychiatrist. [*Id.*]. An addendum to Dr. Ledbetter's notes indicates that Plaintiff's daughter called and stated Plaintiff was suicidal when she heard she would be discharged from the emergency room. [*Id.*]. Although Plaintiff had denied it previously, she now stated that she was suicidal. [*Id.*]. Plaintiff was then admitted for further care with Dr. Howard Strickler. [*Id.*].

Dr. Strickler's treatment notes detail Plaintiff's drug history, including her use of Lortab for at least eleven years and methodone use for three years. [R. 161]. Plaintiff had taken methadone five days prior to her admission and cocaine four days prior to admission. [*Id.*]. Plaintiff also told doctors she would take Oxycontin, Klonopin, and Xanax "when she can get some." [*Id.*]. Plaintiff reported having used benzodiazepines for the past three years and drinking one to two bottles of wine per day. [*Id.*].

Dr. Strickler described Plaintiff as "thin" and "in some distress due to alcohol and drug withdrawal symptoms." [R. 161]. He noted Plaintiff was "alert and oriented" but "appear[ed] depressed." [*Id.*]. Upon discharge on February 13, 2008, Plaintiff was diagnosed with opiate dependence, benzodiazepine dependence, alcohol dependence, and cocaine dependence. [R. 161-62]. Her treatment plan called for a referral for further treatment of her chemical dependency. [R. 166].

On March 24, 2008, Plaintiff again presented to the Brookwood Medical Center Emergency Room complaining of anxiety, but showing no suicidal ideation. [R. 170]. She reported that she had finished the phenobarbital provided her during her previous visit. [*Id.*]. The treating physician diagnosed Plaintiff with depression and substance abuse. [*Id.*]. Plaintiff was provided a short course of phenobarbital and referred to Dr. Shawn Harvey. [*Id.*].

The next medical evidence of record is a consultative psychological evaluation performed by Cynthia Neville, Ph.D., on July 28, 2008. [R. 172-76]. Dr. Neville reviewed Plaintiff's records from her two hospital visits in February and March 2008. [R. 172]. Plaintiff reported that she had applied for disability because she was unable to hold a job due to her anxiety. [*Id.*]. Plaintiff told Dr. Neville she left her most recent clerical position in 2004 because she "couldn't take it no more." [*Id.*]. Although Plaintiff was not currently taking any prescription medication, it was noted that she had been troubled by feelings of depression and anxiety for the past five years. [*Id.*]. Plaintiff could not describe her symptoms other than to say "I can't think" and "I can't function." [R. 172-73]. "[Plaintiff] denied any history of substance abuse issues and claimed she had not used cocaine for 'about a year' and started drinking wine only a year ago." [R. 173].

Dr. Neville indicated Plaintiff's reported information was suspect given her medical records from Brookwood Medical Center. [*Id.*]. Dr. Neville noted that Plaintiff "evidenced a tendency to blame others for her problems and attempted to deny or downplay her reported substance abuse issues." [R. 174]. Dr. Neville diagnosed Plaintiff with polysubstance dependence (by history) and major depressive disorder. [R. 175]. Dr. Neville opined that because Plaintiff was not transparent about her apparent substance dependence issues, it was impossible to evaluate whether she was motivated to maintain sobriety in the year ahead. [*Id.*]. Dr. Neville concluded, however, that if Plaintiff "were to engage consistently in outpatient psychotherapy coupled with psychiatric medication management over the next 12 months, [her] mild symptoms of agitated depression would likely improve." [*Id.*]. Dr. Neville also commented that Plaintiff "appeared to possess the cognitive abilities to understand work instructions although her ability to remember and follow through might be limited by her symptoms of agitated depression to a mild degree." [*Id.*]. Additionally, Dr. Neville noted Plaintiff's ability to interact appropriately with coworkers and supervisors or to handle typical work pressures "would likely be negatively impacted by her symptoms of agitated depression to a mild degree at times." [*Id.*].

On August 5, 2008, Dr. Robert Estock, a state agency examiner, completed a Mental Residual Function Capacity ("RFC") Assessment and a Psychiatric Review Technique ("PRT") of Plaintiff. [R. 178-95]. As part of the Mental RFC Assessment, Dr. Estock concluded that Plaintiff was not significantly limited or moderately limited in the areas of understanding and memory, and sustained concentration and persistence. [R. 178]. Dr. Estock further determined that Plaintiff was not significantly limited in the areas of social interaction and adaptation. [R. 179]. Regarding Plaintiff's functional capacity, Dr. Estock found that Plaintiff was capable of

remembering locations and work-like procedures, as well as understanding, remembering, and carrying out short simple instructions. [R. 180]. As part of the PRT, Dr. Estock concluded that Plaintiff's affective and substance addiction disorders resulted in a mild restriction of activities of daily living, and moderate difficulties in social functioning and maintaining concentration, persistence, or pace. [R. 192]. He also determined Plaintiff suffered one or two episodes of decompensation. [*Id.*].

Dr. Norman Huggins treated Plaintiff over a period of two months at the Jefferson/Blount/St. Clair Counties Mental Health Authority ("JBS MH Authority"). [R. 197-215]. Plaintiff's first visit was on July 17, 2009. [R. 206-12]. Dr. Huggins noted that Plaintiff was "tearful" throughout their interview, but her behavior and demeanor were socially appropriate. [R. 206-11]. He further noted Plaintiff displayed a sense of humor, but her mood was "anxious and depressed." [R. 212]. Plaintiff returned for a follow-up visit on July 24, 2009, reporting that she was anxious and had difficulty remembering. [R. 204]. Plaintiff also indicated that she could not focus long enough to watch a two hour movie. [R. 205]. While performing cognitive exercises, Plaintiff began to cry and said she could not make decisions and could not focus. [R. 204]. At the time of this visit, Plaintiff was receiving treatment at the Foundry Medical Center. [R. 205]. Dr. Huggins commented that Plaintiff remained fearful and sad, and noted that Plaintiff was taking Prozac and Lexapro as prescribed. [*Id.*].

Plaintiff saw Dr. Huggins again on August 6, 2009. [R. 202]. Before this visit, Plaintiff had returned to the Foundry Medical Center where she received a prescription for high blood pressure. [*Id.*]. Plaintiff stated that she was "struggling to survive" and did not have food consistently. [*Id.*]. Plaintiff also reported difficulty concentrating and focusing her attention. [*Id.*]. Plaintiff did state that she had suicidal thoughts, but had no plan. [*Id.*]. During this visit,

Plaintiff was diagnosed with moderate-major depressive disorder. [R. 203]. Dr. Huggins prescribed Lorazepam for Plaintiff's anxiety and also refilled her Lexapro prescription. [*Id.*].

When Plaintiff returned on August 14, 2009, she continued to be anxious, fearful, and depressed. [R. 201]. It was noted that she had not filled her prescriptions due to a lack of transportation. [R. 201]. When Plaintiff saw Dr. Huggins again on August 28, 2009, she had obtained her medication and stated that she could tell a difference in the way she felt. [R. 199]. Plaintiff was reported as calm. [*Id.*]. Additionally, her shaking and trembling had ceased. [*Id.*]. Dr. Huggins indicated that Plaintiff "was not back to [her] normal self even though she [felt] better." [*Id.*]. Plaintiff was continued on her current regimen of medications. [R. 200].

Plaintiff saw Dr. Huggins again on September 18, 2009. [R. 197]. Plaintiff told Dr. Huggins that she was not motivated to do anything and could not function. [*Id.*]. She also indicated that she does not socialize with people because she does not want to be around them. [*Id.*]. Plaintiff stated that she could not cope with the pressure of preparing for work. [*Id.*]. Plaintiff was instructed to follow-up as needed. [*Id.*]. Plaintiff requested documentation of her medical information work requirements in order to complete a supplemental questionnaire related to the State Food Stamp Program. [R. 196-97]. Dr. Huggins completed the form, noting that Plaintiff's mental condition prevented her from working and he believed her condition is permanent. [*Id.*].

Dr. Huggins also completed a supplemental questionnaire drafted by Plaintiff's attorney that day. [R. 224-25]. Dr. Huggins opined that Plaintiff's mental condition resulted in marked limitations in the following areas: activities of daily living; difficulty in maintaining social functioning; ability to understand, carry out, and remember instructions in a work setting; respond appropriately to supervision in a work setting; and respond appropriately to co-workers

in a work setting. [*Id.*]. Dr. Huggins also concluded that Plaintiff's mental condition resulted in extreme limitations in the following areas: concentration, persistence, or pace and ability to respond to customary work pressures. [R. 224]. Dr. Huggins further indicated that Plaintiff's current medications caused fatigue, blurred vision, nightmares, frequent awakenings, upset stomach, acid reflux, dizziness, and sleepiness. [R. 225].

Plaintiff saw a mental health therapist at JBS Mental Health Authority on September 25, 2009. [R. 223]. Treatment notes indicate that Plaintiff was in a good mood and reported that she "[was] doing so much better." [*Id.*]. Plaintiff was not crying every day and had no major problems or concerns. [*Id.*]. This same therapist saw Plaintiff again on October 6, 2009. [R. 221]. During this visit, Plaintiff stated that she was upset because of marital problems. [*Id.*]. By October 16, 2009, Plaintiff was "doing better" and indicated that she was able to cope while taking Lexapro. [R. 219]. During a visit on October 23, 2009, the therapist indicated that Plaintiff had been to court earlier that day and pleaded guilty to a charge of drug possession. [R. 217]. The therapist noted that this charge is different from Plaintiff's original description when she reported that she went to the police herself to turn in cocaine that had been found in her car. [*Id.*]. No treatment plan information was provided in this report. [R. 219-20].

On December 30, 2009, Plaintiff saw Dr. Huggins once again. [R. 233]. Plaintiff indicated that she was having difficulty coping from month to month, but that she "[felt] optimistic about the disability." [*Id.*]. Dr. Huggins increased Plaintiff's Lorazepam dosage and continued her Lexapro prescription. [*Id.*]. Plaintiff was instructed to follow-up as needed. [*Id.*]. After a visit on February 3, 2010, when she reported feeling anxious and was seen trembling, Dr. Huggins referred Plaintiff to Western Mental Health Center. [R. 232]. By March 31, 2010, Plaintiff indicated that she did not believe her medications were working. [R. 230]. Dr. Huggins

suggested Plaintiff may have built-up an immunity to her current medications, and as a result, Dr. Huggins prescribed different medicine. [*Id.*].

In response to a hypothetical question from the ALJ (based on the limitations noted by Dr. Neville and Dr. Estock),[2] a vocational expert ("VE") testified that Plaintiff could perform her past relevant work as a data entry clerk. [R. 48]. In response to a hypothetical based upon Dr. Huggins's supplemental questionnaire, the VE testified that Plaintiff could not perform her past relevant work or any work. [R. 49].

## II.     ALJ Decision

Determination of disability under the Act requires a five step analysis. *See* 20 C.F.R. § 404.1 *et. seq.* First, the ALJ determines whether the claimant is engaging in substantial gainful activity. Substantial gainful activity is defined as work activity that is both substantial and gainful. If a claimant engages in substantial gainful activity, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. If the claimant is not engaging in substantial gainful activity, the analysis proceeds to the second step.

Second, the ALJ determines whether the claimant has a medically determinable impairment that is severe or a combination of impairments that is severe. If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

---

[2] These limitations included no exertional restrictions; the hypothetical plaintiff could remember locations and work-like procedures; is able to understand, remember and carry out short, simple instructions; would have moderate difficulty handling more detailed instructions, but could probably handle even those if they were broken down into simple one and two-step tasks and given adequate time to rehearse; and is able to maintain attention sufficient to complete simple one and two-step tasks for periods of up to two hours at a time without special supervision or extra rest periods. [R. 47-48].

Third, the ALJ determines whether the claimant's impairment or combination of impairments meets or equals the criteria of an impairment listed in Appendix 1, Part 404, of the Regulations. Before considering the fourth step of the sequential evaluation process, the ALJ must first determine the claimant's residual functional capacity ("RFC"). The claimant's RFC is what the claimant can do despite her impairments. Next, the ALJ must determine whether the claimant has the RFC to perform the requirements of her past relevant work. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and final step.

In the final step, the ALJ determines whether the claimant is capable of performing any other work considering her RFC, age, education, and past work experience. In making this final determination, the Commissioner will use the Medical-Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and RFC are the same as the criteria listed in the Appendix. If the ALJ finds the claimant is not able to do other work and meets the duration requirement, she is disabled. However, if the Commissioner finds that the claimant is able to do other work, she is not disabled. The court recognizes that "the ultimate burden of proving disability is on the claimant" and that "the claimant must establish a *prima facie* case by demonstrating that [s]he can no longer perform h[er] former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted). Once a claimant shows that she can no longer perform her past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." *Id.*

The ALJ found that Plaintiff had not engaged in substantial gainful activity since February 21, 2008, her alleged onset date of disability, and that she met the insured status

requirements of the Act through September 30, 2009. [R. 24].  The ALJ concluded that Plaintiff has major depressive disorder and a history of drug and alcohol induced dependence now in remission, both of which are "severe" impairments under the Act.  [*Id.*].  Nonetheless, the ALJ determined Plaintiff's impairments neither meet nor equal the requirements for any impairment in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. [R. 25].

After consideration of the entire record, the ALJ found that Plaintiff has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: she is able to remember locations and work-like procedures; she is able to understand, remember, and carry out simple instructions; she may have moderate difficulty handling more detailed instructions but can likely handle those instructions if they are broken down into simple 1 to 2 step tasks and she is given adequate rehearsal; and she is able to maintain attention sufficiently to complete simple 1 to 2 step tasks for periods up to two hours at a time without special supervision or extra rest periods. [R 27].  The ALJ further concluded that Plaintiff is capable of performing her past relevant work as a data entry clerk because this work does not require the performance of work-related activities precluded by her RFC. [R. 30].  Thus, the ALJ ruled that Plaintiff is not disabled under sections 216(i) and 223(d) of the Act and therefore, is not entitled to a period of disability. [*Id.*].

### III.   Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision reversed, or in the alternative, remanded for further consideration.  Plaintiff argues that the ALJ's decision is not supported by substantial evidence and improper legal standards were applied because (1) the ALJ improperly concluded that she can perform her past relevant work, and (2) the ALJ misapplied the Eleventh Circuit's "treating physician" rule. [Pl.'s Mem. at 5-10].

**IV.     Standard of Review**

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42, United States Code, Sections 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

**V.     Discussion**

    **A.     Substantial Evidence Supports the ALJ's RFC Assessment and His Decision That Plaintiff Can Return to Past Relevant Work.**

Plaintiff contends that the ALJ erred in finding that she could perform her past relevant work as a data entry clerk. [Pl.'s Mem. 5-8]. In support of her argument, Plaintiff maintains that

it was an error for the ALJ to exclude moderate limitations in his PRT assessment from her RFC. [Pl.'s Mem. 6]. Plaintiff also argues that the ALJ did not adequately clarify how she could perform semiskilled work with her current RFC limitations. [Pl.'s Mem. 6]. Additionally, Plaintiff contends that the ALJ erred by relying on vocational expert ("VE") testimony that she could perform semiskilled work if broken into 1-2 step tasks. [Pl.'s Mem. 7-8]. Finally, Plaintiff proposes that the ALJ's exertional capacity finding of "potentially very heavy work," a higher level than ever performed by her and within three months of advanced age at her date last insured of September 2008, was "harsh." [Pl.'s Mem. 10-11].

As an initial matter, Plaintiff's arguments concerning the ALJ's determination of her RFC and ability to return to past relevant work warrant dismissal because of their conclusory nature. "Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived." *N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998). Plaintiff's challenge of the ALJ's determination fails to cite any relevant case law and quotes only a Social Security Ruling ("SSR"). [Pl.'s Mem. 6-7]. After quoting a possibly relevant SSR[3], Plaintiff failed to adequately explain its relevance to her argument, making unclear assertions and conclusory statements that "performance of simple 1-2 step tasks cannot be morphed into semiskilled work by any means or rationale." [Pl.'s Mem. 8].

Alternatively, the court concludes that the ALJ's findings are supported by substantial evidence. The ALJ posed a hypothetical question to the VE containing limitations found by Dr. Neville and Dr. Estock, and the VE determined that Plaintiff could perform her past relevant work as a data entry clerk under those conditions. [R. 48]. These limitations were identical to those later included in Plaintiff's RFC assessment by the ALJ [R. 27]; therefore, the ALJ had

---

[3] Plaintiff appears to make an argument that the ALJ erred in relying on VE testimony that conflicted with the Dictionary of Occupational Titles ("DOT") skill levels. However, without properly showing a conflict between the two, or citing case law appropriate to the matter, the court finds this argument misses the mark.

expert testimony supporting his decision that Plaintiff could perform past relevant work with her current RFC. Based upon the VE's testimony, the medical records, and the ALJ's analysis, the court finds substantial evidence supports the ALJ's RFC determination of Plaintiff and his finding that she could return to past relevant work.

### B. The ALJ Correctly Applied the "Treating Physician" Standard.

Plaintiff next argues that the ALJ erred in his application of the Eleventh Circuit's "treating physician" rule by assigning little weight to Dr. Huggins's opinion. [Pl.'s Mem. 8-10]. Plaintiff contends Dr. Huggins's treatment notes are consistent with his assessment of her. [Pl.'s Mem. 9]. She also states "[i]f longevity of the condition or treatment was an issue for the ALJ, his reliance on the State Agency physician's opinion was misplaced since Dr. Estock did not see Plaintiff at all." [Pl.'s Mem. 9-10]. Finally, Plaintiff objects to the ALJ's inference that Dr. Huggins was unaware of her past substance abuse, claiming that Dr. Huggins made "copious notes" about Plaintiff's substance abuse history and also argues that the ALJ's severity determinations apply without consideration of substance abuse. [Pl.'s Mem. 10].

When determining the weight of a medical source's opinion, an ALJ considers several factors dictated by the Federal Regulations which include treating and examining relationship with the claimant, length of treatment and frequency of examination, the evidence offered to support the opinion, the opinion's consistency with the record as a whole, and other factors. *See* 20 C.F.R. § 404.1527(c). "It is well-established that 'the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'" *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). "Good cause" exists "where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding.

14

We have also found good cause where the doctors' opinions were conclusory or inconsistent with their own medical records." *Lewis*, 125 F.3d at 1440 (citations omitted).  Furthermore, if an ALJ considers a treating physician's opinions and bases his "rejection of them on record evidence that contradicted those opinions," rejection of those opinions alone is not in itself grounds for reversal.  *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990). *See also Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

The ALJ afforded little weight to Dr. Huggins's opinions based upon the conclusion that those opinions relied "upon [Plaintiff's] report and are not consistent with the record as a whole or his own treatment notes."  [R. 29].  Plaintiff takes issue with this justification, stating the "only example the ALJ could identify" of the inconsistent record was Dr. Huggins's determination that the onset of her mental disorder occurred in 2005, when he only began treating her in 2009. [Pl.'s Mem. 9].  However, this argument is without merit.  It ignores the fact that the ALJ stated that Plaintiff's onset date contradiction is "an example" and that the ALJ referred to the other inconsistencies as "discussed above."  [R. 29].  Earlier in his decision, the ALJ had mentioned a discrepancy between Dr. Huggins's own treatment notes and the supplemental questionnaire he completed.  [R. 26].  In September 2009, Dr. Huggins found that Plaintiff experienced marked restrictions in social functioning and various activities in the work setting.  [R. 224-25]. The ALJ contrasted this with Dr. Huggins's opinion on August 2, 2009, where he indicated that Plaintiff suffered only moderate limitations in mental, social, occupational, and financial areas.  [R. 26, 203].  The ALJ also noted that Dr. Huggins opined Plaintiff suffered extreme deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner [R. 224], which conflicted with Dr. Huggins's own treatment notes that illustrated Plaintiff "was capable of attending therapy sessions on a regular

and consistent basis, and providing relevant information for her mental health treatment." [R. 26]. The deficiencies were also contrasted with Plaintiff's ability to consistently report for TASC drug screening on "ostensibly a weekly basis." [*Id.*]. Therefore, the court finds the record contains substantial evidence, as indicated by the ALJ, supporting a "good cause" to provide little weight to Dr. Huggins's opinions.

The court rejects Plaintiff's latter two arguments concerning the ALJ's application of the "treating physician" standard. Plaintiff contends that if the ALJ was concerned with longevity of treatment by Dr. Huggins, he misplaced the weight given to Dr. Estock because he was not an examining physician. [Pl.'s Mem. 9-10]. However, the ALJ did not use longevity of treatment or condition to discredit Dr. Huggins's opinions; rather, he focused more on the inconsistent nature of the doctor's notes when compared to his diagnoses. [R. 26, 29]. The same can be said for the second of Plaintiff's arguments regarding her history of substance abuse. [Pl.'s Mem. 10]. To be sure, it appears that the ALJ was concerned that Dr. Huggins was unaware of Plaintiff's substance abuse problems during the supplemental hearing in 2008. Nevertheless, he did not indicate any reliance on this point when he discredited Dr. Huggins in his written opinion. [R. 48]. Therefore, the court finds that both arguments lack merit because the ALJ did not cite either concern as a reason for giving little weight to Dr. Huggins's opinions.

## VI. Conclusion

The court concludes that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed and a separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** on August 27, 2013.

_____

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE